IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

DMITRIY KHAVKIN,

     Petitioner,

v.                                  Civil Action No. 3:16CV576

HAROLD CLARKE,

     Respondent.

**MEMORANDUM OPINION**

Dmitriy Khavkin, a Virginia prisoner proceeding with counsel, brings this SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS under 28 U.S.C. § 2254 ("SAP" ECF No. 31).[1]  Respondent has filed a MOTION TO DISMISS AND RULE 5 ANSWER ("Motion to Dismiss," ECF No. 32).  An evidentiary hearing was held and the Motion to Dismiss has been fully briefed.  For the reasons set forth below, the Motion to Dismiss (ECF No. 32) will be granted and the SECOND AMENDED PETITION FOR WRIT OF HABEAS CORPUS under 28 U.S.C. § 2254 (ECF No. 31) will be denied.

---

[1] The Court notes that Khavkin spells his first name and last name two different ways in his filings.  (See ECF No. 31, at 1; ECF No. 37, at 1.)  This Memorandum Opinion uses the spelling in the caption of the SAP.

## I.   BACKGROUND

The Court has issued three previous opinions respecting this petition.  This Memorandum Opinion will not recount the procedural issues covered extensively in those opinions.  Following a guilty plea in the Circuit Court for Brunswick County, Virginia ("Circuit Court"), Khavkin was convicted of second-degree murder, assault and battery, and attempted robbery.  (ECF No. 34-3, at 23.)  The Circuit Court sentenced Khavkin to the bargained for sentence of twenty-four years and two months of imprisonment.  (ECF No. 34-1, at 1-2.)

In the SAP, Khavkin presented the following claims for relief:

Claim I:   "Petitioner was denied the effective assistance of counsel, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, because his counsel had a conflict of interest, which neither defense counsel, nor the prosecutor brought to the Court's attention, and which caused his counsel to compel him to waive his right to trial and plead guilty."  (ECF No. 31, at 5) (emphasis added).

Claim II: "Petitioner was denied the effective assistance of counsel because his conflicted counsel coerced him into a guilty plea and provided him with erroneous advice as to the consequences of a guilty plea, all in violation of the Sixth and Fourteenth Amendments to the United States Constitution." (Id. at 10) (emphasis added)

Claim III: "Petitioner was denied the effective assistance of counsel because his counsel provided erroneous advice as to the consequences of a guilty plea, in violation of the Sixth and Fourteenth Amendments to the United States Constitution." (Id. at 12) (emphasis added)

Claim I thus was based on an alleged coerced guilty plea prompted by an alleged conflict of interest on the part of counsel. By Memorandum Opinion and Order entered on April 12, 2019, the Court resolved much of the SAP.  To begin, Claim II was dismissed as defaulted and barred from review here.  (ECF No. 39, at 20-23.) Also, the Court concluded that:  "Claim III is in two parts:  (1) a denial of the effective assistance because counsel allegedly coerced a guilty plea (apparently because of the conflict of interest); and (2) counsel allegedly provided erroneous advice about the consequences of a guilty plea (apparently that the guilty plea would activate a suspended sentence)."  (ECF No. 39, at 32.) One part was denominated as the "coercion" component; the other was denominated as the "consequences" component.  The "consequences" component of Claim III was dismissed because it was barred by the validly entered Plea Agreement.  (Id. at 37.)  That left for resolution, Claim I and part of Claim III, both based on coercion.

Khavkin's allegations in Claim I and in what remains of Claim III are one in the same.  Khavkin alleged that trial counsel had a conflict of interest and that, as a result, counsel coerced Khavkin into pleading guilty.  For the reasons set forth below, the Court finds that Khavkin has failed to satisfy his burden to prove that counsel's potential conflict ripened into an actual conflict that adversely affected his counsel's performance.  In

the alternative, the Court finds that Khavkin also waived any potential conflict. Accordingly, the Motion to Dismiss will be granted with respect to Claims I and III, and the SAP will be denied.

## II.   STANDARD OF REVIEW AND BURDEN OF PROOF

A petitioner collaterally attacking his conviction in state court bears the burden to prove that his custody under a state-court judgment violates the Constitution or laws of the United States. 28 U.S.C. § 2254(a)(1). The burden of proving the grounds for collateral attack is by a preponderance of the evidence. Vanater v. Boles, 377 F.2d 898, 900 (4th Cir. 1967) (citing Bates v. Meadow, 358 F.2d 674, 675 (6th Cir. 1966)). An evidentiary hearing is an instrument to test the truth of facts already alleged in the habeas petition." Jones v. Polk, 401 F.3d 257, 269 (4th Cir. 2005) (citations omitted).

## III. SUMMARY OF FACTS REGARDING THE ALLEGED CONFLICT

### A.   Initial Criminal Proceedings

A grand jury in the Circuit Court for the County of Brunswick, Virginia ("Circuit Court") charged Khavkin in a five-count Indictment with one count of murder in the first degree in the commission of, or attempt to commit robbery ("first-degree murder"), one count of make/possess unauthorized weapon capable of death/injury, two counts of attempted robbery, and one count of

4

malicious wounding.   Indictment at 1-2, Commonwealth v. Khavkin, Nos. CR13-73-00 through 04 (Va. Cir. Ct. filed Mar. 28, 2013). The charges against Khavkin were based on the following events:

> On June 7, 2012, Defendant was an inmate in Lawrenceville Correctional Center.   Defendant was assigned to 30 building, 31 pod.   Defendant entered the 32 pod with co-defendant Kayvon Crews.   32 pod has the designation of "honor pod."  To qualify for honor pod, an inmate must be charge free for a minimum of one year.  32 pod was an unauthorized area for both Defendant and co-defendant Crews.
>     Once in 32 pod, Defendant and Crews entered cell #205 and confronted an inmate with the intent to rob the inmate.   The cellmate of the prospective robbery victim along with another inmate, came into cell #205 and dissuaded Defendant and Crews from robbing this initial prospective victim.   Defendant was in possession of a homemade knife.  After talking with other inmates in 32 pod, Defendant and Crews gained entry to cell 120, where cellmates Dwayne McKoy and William Myers were sleeping. Defendant and Crews confronted inmates McKoy and Myers. Both McKoy and Myers stood up beside their bunks and began to resist the attempt to rob them.  Victim McKoy fought with Defendant and Victim Myers fought with co-defendant Crews.  Defendant produced the homemade knife, which was the only weapon used during the assaults in the cell.  Co-defendant Crews beat Victim Myers with his fists until Myers fell down and was dazed if not unconscious.  Defendant called for the assistance of co-defendant Crews while Defendant was fighting with Victim McKoy.  Co-defendant Crews pulled Victim McKoy away from Defendant.  As this was done, Defendant stabbed McKoy on the left side of McKoy's chest with the homemade knife, and McKoy's body lurched to the left.  At some point during this confrontation between Defendant and McKoy, McKoy had his hands around Defendant's neck. Defendant's neck was scratched and Defendant's DNA was found beneath McKoy's fingernails.   After McKoy and Myers were both injured, Defendant and Co-defendant Crews sought to leave cell 120.  Crews stopped to take the television of the Victims and Defendant told him to leave it and that they needed to get out of the pod.

After the defendants left cell 120, Victim Myers came out of the cell to try to alert an officer to the injury of McKoy.  In doing so, Myers again came into contact with co-defendant Crews.  Myers hit Crews with a "hot pot" and Crews beat Myers again until Myers fell to the ground.  During this time, Defendant went to the upper tier of 32 pod, tried to hide in the cell of another inmate, and slid the homemade knife underneath the utility room door.  The knife was later found during a search by the facility security staff.  <u>The knife was found to contain McKoy's DNA on the blade.</u>  The knife was described as a metal, ten inch long knife, honed on the edges and sharp on the point.  It is believed that the knife was made from a part off of a floor buffer used in the facility.

Co-defendant Crews was taken into custody in 32 pod after his final assault on victim Myers.  <u>Myers identified a white male from 31 pod as the other assailant.  Security staff</u> conducted a search of all white male inmates in 31 pod and <u>found Khavkin with scratches on his neck and torso.</u>  Defendant Khavkin was taken to segregation where he claimed that the scratches were a result of a basketball game and /or horseplaying.  When Defendant discovered that Victim McKoy had died, Khavkin reacted by crying, saying "Oh my God, Oh my God" and "<u>I didn't mean to do it</u>."

Victim <u>McKoy suffered a fatal stab wound to the chest</u> which went into and almost through his heart.  McKoy <u>also had a stab wound to one temple</u>, bruises to the other temple and cuts on the inside of his lips.  Victim <u>Myers had a broken nose</u>, <u>a laceration to his lip</u>, <u>bruising and swelling of his face</u>.  <u>Myers</u> was taken by medflight to <u>MCV where he stayed for two days.</u>

McKoy's DNA was found on clothing items worn by Crews and on pants and boots found within Defendant Khavkin's personal property.

(ECF No. 34-3, at 24-25 (emphasis added).)

In September 2012, Khavkin's family hired Joseph D. Morrisey as defense counsel because he was recommended to Khavkin by another inmate.  (ECF No. 60, at 19-20; Evid. Hrg. Resp't's Ex. 1, at 1.) In May 2013, Morrissey engaged another lawyer, James T. Maloney,

to assist in Khavkin's defense.   (ECF No. 60, at 80; Evid. Hrg. Ex. 1, at 12-13.)[2]  On May 22, 2013, Morrisey sent a letter to the Clerk of the Circuit Court, with a copy to both Marina Khavkin, Khavkin's sister, and to Khavkin himself, notifying the Circuit Court that, "Attorney James T. Maloney will be assisting me in the case.  I would appreciate your noting both of as counsel of record for Mr. Khavkin in these matters."  (Evid. Hrg. Ex. 9, at 132.) Maloney indicated his association meant that he and Morrissey "would be working together on the case."  (ECF No. 60, at 82.) However, from that point forward, and as discussed in greater

---

[2] It is not entirely clear why Morrissey brought Maloney into the case.  However, Morrissey explained in his affidavit filed in state court that he "regularly associate[d] Mr. Maloney on cases and ha[d] worked with Mr. Maloney on over two (2) dozen murder cases through the years."  (Evid. Hrg. Resp't's Ex. 1, at 2.) Maloney explained that "[i]t's not uncommon for Mr. Morrissey to have associated me in . . . [as] second chair or associated me in to assist on the case."  (ECF No. 60, at 82-83.)  Morrissey's bar license was suspended in 1993 for six months, and again in 2000 for three years. See Morrissey v. Virginia State Bar ex rel. Third Dist. Committee, 538 S.E.2d 677, 680, 682 (Va. 2000).  Morrissey subsequently was disbarred in 2003, his license to practice was reinstated in 2012, and he was again disbarred in 2018. See Brief of Appellee, Morrissey v. Virginia State Bar ex rel. Third Dist. Committee, 2019 WL 7821110, at *9-10 (Va. filed Mar. 8, 2019). However, Morrissey's deplorable record, laced as it is with many citations for misconduct and two disbarments, does not necessitate discrediting his testimony (as the Court otherwise be inclined to do), because Maloney's testimony supplied the necessary proof on the point.

detail below, see Part V.C., Maloney, not Morrissey was the attorney who met with, and advised, Khavkin.[3]

## B.   Source Of The Potential Conflict

It is Maloney's alleged conflict of interest that is the source of the coercion alleged in Claims I and III.  And so, to that issue we now turn.

The record shows that, beginning in December 2001, approximately ten years before the murder of McKoy and the assault on Myers, Maloney had represented Myers in the Colonial Heights General District Court, in a pretrial bond hearing on a charge of using a firearm in threat, robbery, and conspiracy.  (ECF No. 60, at 88; Evid. Hrg. Ex. 9, at 133, 137.) The representation was brief because, on January 28, 2002, the Circuit Court granted Maloney's request to withdraw as Myers' counsel.  (Evid Hrg. Ex. 9, at 141.)

In preparing to defend Khavkin on the charges of murdering McCoy and assaulting Myers, Maloney interviewed Myers.  (ECF No. 60, at 85.)[4]  Maloney testified that his interview with Myers was "a bit unusual," because Myers "indicated to me when he first sat down to meet with me that he intended not to speak with whoever came to talk to him from the defense team except that he had

_____

[3] Reprehensible though it may be, Morrisey's abandonment of his contracted for representation of Khavkin is not put at issue in the SAP.  So, it will not be further discussed.

[4] Maloney also interviewed other witnesses, including another inmate and employees of the Department of Corrections.  (ECF No. 60, at 85-86.)

learned it was me, and he knew me from having previously represented him. So because of that, he was going to talk to me." (Id. at 86.)

Maloney did not believe that his previous representation of Myers presented an actual conflict of interest in representing Khavkin. (ECF No. 60, at 123.) In fact, Maloney did not recognize Myers from the previous representation. (Id. at 86.) And, Maloney "couldn't recall anything that wasn't already provided to me by the Commonwealth about his case" and, "[i]n fact, what the Commonwealth provided [Maloney with] was far more detailed than what [Maloney] could recall." (Id.)

During the interview, Maloney explained to Myers that he was representing Khavkin and "that if [Myers] was called as a witness, I would have to cross-examine him [Myers]" (id. at 86), and that he "would be taking a role adverse to [Myers], and [Myers] said that was fine." (Id. at 95.) According to Maloney, Myers said that he would tell the truth no matter who asked him questions so that he did not have a problem with Maloney cross-examining him. (Id. at 87.) Maloney then had Myers sign a conflict waiver, which stated, in relevant part, that he and Maloney had

> discussed w/ James Maloney [the] conflict of interest based on James Maloney's previous representation of me and his current representation of Dmitri Khavkin in Brunswick Circuit Court. Mr. Maloney represented me over 10 years ago in an unrelated matter. I don't know of any confidence Mr. Maloney learned about me in his representation of me that would cause a conflict in this

> matter. I have no objection to his representing Mr.
> Khavkin even though he may have to discredit me as a
> witness in that case.

(Evid Hrg. Ex. 3, at 59.) The waiver was written in Maloney's handwriting, with an "X" to mark the spot where he had Myers sign the waiver. (ECF No. 60, at 89.) It is undisputed that Myers signed this waiver in Maloney's presence. (<u>Id.</u>) Myers's waiver was retained in Maloney's file in Khavkin's case. (<u>Id.</u>) Although Maloney did not believe he had a conflict, Maloney also had Khavkin sign a waiver of conflict form.[5]

### C.    Khavkin's Guilty Plea

On December 5, 2013, Khavkin entered into a Plea Agreement. As initially charged, Khavkin was facing a sentence of life plus forty-five years for the five counts in the indictment.[6] The Commonwealth agreed to allow Khavkin to plead guilty to the lesser offense of second-degree murder of McKoy (instead of first-degree murder) and to the lesser offense of assault and battery of Myers, a misdemeanor (instead of malicious wounding which is a felony). (ECF No. 34-3, at 22-23.) Khavkin also pled guilty to one count

---

[5] Khavkin's waiver is discussed in greater detail in Part V.C.

[6] The five charges carried sentences as follows: first-degree murder subjected Khavkin to life imprisonment; make/possess an unauthorized weapon capable of death/injury subjected Khavkin to up to five years of imprisonment; two counts of attempted robbery subjected Khavkin to up to twenty years of imprisonment; and malicious wounding subjected Khavkin to between five years and twenty years of imprisonment. See Va. Code Ann. § 18.2-10, 18.2-26, 18.2-32, 18.2-58, 18.2-51, and § 53.1-203(4).

of attempted robbery of McKoy.  (Id.)  The Commonwealth agreed to nolle prosequi the charge of make/possess unauthorized weapon capable of death/injury and one count of attempted robbery.  (Id.) In the Plea Agreement, the Commonwealth and Khavkin agreed that, in exchange for his guilty pleas, an active sentence of twenty-four years and two months for second-degree murder was appropriate, with no active time for the attempted robbery or assault and battery convictions.  (Id. at 23-24.)  The Circuit Court sentenced Khavkin to a total of twenty-four years and two months of incarceration as was provided by the terms of the Plea Agreement. (ECF No. 34-1, at 1-2.)  Khavkin filed no appeal.

### IV.   APPLICABLE LAW FOR AN ACTUAL CONFLICT

To establish ineffective assistance of counsel based on a conflict of interest, Khavkin "must establish that an actual conflict of interest adversely affected his lawyer's performance." Cuyler v. Sullivan, 446 U.S. 335, 350 (1980).  If Khavkin establishes that his counsel labored under an actual conflict of interest and that counsel's conflict adversely affected counsel's performance, a presumption of prejudice arises.  See Stephens v. Branker, 570 F.3d 198, 209 (4th Cir. 2009) (citing Strickland v. Washington, 466 U.S. 668, 692 (1984)).  However, the mere "possibility of [a] conflict [of interest] is insufficient to impugn a criminal conviction." Cuyler, 446 U.S. at 350.

To demonstrate that an actual conflict of interest existed, Khavkin "must show that [his] interests diverge[d] [from his attorney's] with respect to a material factual or legal issue or to a course of action." Stephens, 570 F.3d at 209 (alterations in original) (some internal quotations marks omitted) (quoting Gilbert v. Moore, 134 F.3d 642, 652 (4th Cir. 1998)). However, a showing of an actual conflict does not automatically entitle Khavkin to relief. Rather, Khavkin must also show that the actual conflict had an adverse effect on counsel's representation. See Mickens v. Taylor, 535 U.S. 162, 171 (2002).

"Adverse effect cannot be presumed . . . from the mere existence of a conflict of interest." Stephens, 570 F.3d at 209 (quoting Rubin v. Gee, 292 F.3d 396, 401 (4th Cir. 2002)). In a case such as this, to meet the "adverse effect" facet of the conflict calculus, Khavkin must show that "the attorney took action on behalf of one client that was necessarily adverse to the defense of the other or failed to take action on behalf of one because it would adversely affect the other." Williams v. French, 146 F.3d 203, 212 (4th Cir. 1998) (citation omitted). In other words, Khavkin must demonstrate that "the actual conflict of interest compromised his attorney's representation." Stephens, 570 F.3d at 209.

For orderly disposition, the Court will address whether there was an actual conflict and whether there was an adverse effect under separate topic headings.  However, Khavkin must demonstrate both aspects of the test to prevail.  See Mickens v. Taylor, 535 U.S. 162, 171-74 (2002) (explaining that Cuyler requires a defendant to establish that the conflict of interest adversely affected his counsel's performance).  As discussed below, Khavkin fails to demonstrate that an actual conflict of interest adversely affected his trial counsel's performance.

## V.   ANALYSIS

In Claim I, Khavkin argues:

> "Petitioner was denied the effective assistance of counsel, as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution, because his counsel had a conflict of interest, which neither defense counsel, nor the prosecutor brought to the Court's attention, and which caused his counsel to compel him to waive his right to trial and plead guilty."

(SAP Pet. 5 (emphasis added).)  The part of Claim III that remains for resolution echoes the contention in Claim I that, as a result of the conflict of interest, counsel coerced Khavkin into pleading guilty.

Both claims depend upon whether there was an actual conflict of interest.  That issue will be considered first.

13

### A.  Khavkin Fails To Establish That There Was An Actual Conflict

#### 1.  Khavkin's Allegations

Khavkin begins by stating that "Mr. Maloney had previously represented William Myers, the alleged victim in the malicious wounding count and one of the attempted robbery charges, on a charge of robbery in the Circuit Court of the City of Petersburg." (SAP ¶ 30.)  According to Khavkin, he was unaware of the conflict and did not waive it, and only learned about the potential conflict from state habeas counsel.  (Id. ¶¶ 37-38, 45.)[7]  Khavkin asserts that "Mr. Maloney is presumed to have known confidential information from his representation of Myers" and, "[o]n information and belief, Mr. Maloney actually knew confidential information." (Id. ¶¶ 31-32.)  Thereupon, Khavkin concludes, "[b]elieving that he would have no representation if he refused to plead guilty, and that he had no choice but to proceed with Mr. Maloney, Petitioner was compelled to plead guilty, and did plead guilty." (Id. ¶ 41.)  The assessment of these contentions is made, first by laying out the framework for assessing actual conflict claims, and then measuring Khavkin's claims within that framework.

---

[7] This allegation is patently false as discussed in Part V.C.

2.    **The Legal Framework In Assessing Actual Conflict In Successive Representations**

"In a successive representation case, mere proof that a criminal defendant's counsel previously represented a witness is insufficient to establish [an actual conflict]." Smith v. White, 815 F.2d 1401, 1405 (11th Cir. 1995). Nonetheless, there exists a "fear in successive representation cases is that the lawyer will fail to cross-examine the former client rigorously for fear of revealing or misusing privileged information." Moss v. United States, 323 F.3d 445, 460 (6th Cir. 2003) (citations omitted).

Although Maloney's previous representation of the victim, Myers, created a potential conflict of interest, the necessary inquiry here is whether that potential ripened into an actual conflict of interest. To determine "whether successive representation has given rise to an actual conflict of interest," courts consider a number of factors:

> (1) whether "the current and former cases are substantially related;" (2) whether the attorney has obtained confidential information from the client; (3) the temporal relationship between the prior and successive representations, particularly whether the prior representation was "unambiguously terminated" before the successive representation commenced; and (4) whether the attorney has a "pecuniary interest in possible future business" from the former client." Regardless of which of these factors (if any) may be relevant to a particular instance of successive representation, the ultimate question is "whether counsel's allegiance to the accused was compromised by competing obligations owed to other clients."

15

<u>Chandler v. Lee</u>, 89 F. App'x 830, 840-41 (4th Cir. 2004) (internal citations omitted) (emphasis added); <u>see</u> <u>also</u> <u>Freund v. Butterworth</u>, 165 F.3d 839, 859 (11th Cir. 1999) (explaining that "it is more difficult to prove that successive representation caused an actual conflict of interest than that simultaneous representation did so" and identifying similar factors as (1), (2), and (3) above).

> a. **No Substantial Relation, Temporal Relationship, or Pecuniary Interest In Future Business (Factors (1), (3), and (4))**

The undisputed record is that the successive representations here at issue, were entirely unrelated; that different charges were involved; that the representations were separated by approximately eleven years; and that Maloney's previous representation of Myers had been unambiguously terminated long ago. <u>See Chandler</u>, 89 F. App'x at 841. There is no evidence that Maloney hoped or expected to represent Myers, who was clearly incarcerated, and thus, no evidence of a pecuniary interest in possible future business from Myers. <u>See id.</u> Thus, factors (1), (3), and (4) militate against a finding that the potential conflict matured into an actual one.[8]

_____

[8] Khavkin argues, in conclusory terms, that there is some significance in the fact that both cases (Myers's and Khavkin's) involved the same offense-robbery. There is no merit to that argument.

                     **b.**    **No Relevant Confidential Information (Factor (2))**

Khavkin hangs his hat on the assertion that it is "presumed" that Maloney had confidential information about Myers and that, standing alone, this presumption establishes that an actual conflict existed.   However, Khavkin has identified no relevant confidential information that Maloney had from his representation of Myers that would affect his performance in Khavkin's proceedings.[9]

Although Maloney presumably would have obtained confidential information from Myers during the representation in 2001, the record here discloses no confidential information known to Maloney about Myers that was relevant to Khavkin's defense in 2013. Maloney testified that he did not remember anything about his representation of Myers and, indeed, did not even remember Myers when he met Myers to interview him for Khavkin's case.  (ECF No. 60, at 86.)   Further, even after Myers explained the previous

---

[9] Buried in the Brief in Opposition, Khavkin argues that, "It is undisputed that Maloney previously represented Myers, an alleged victim in the case and critical Commonwealth witness, and it is presumed that Maloney obtained confidential information as a result of that representation.  That presumption has not been rebutted."  (Br. Opp'n 13, ECF No. 37.)   While a presumption may exist that an attorney receives "confidential communications in the course of his representation of a client" (United States v. Shepard, 675 F.2d 977, 980 (8th Cir. 1982)), that hardly helps Khavkin here.   There is no presumption that counsel received confidential information from the victim Myers that is relevant to his representation of Khavkin more than ten years later.

representation, Maloney did not remember Myers or the 2001 case. (Id.) Maloney "couldn't recall anything that wasn't already provided to [him] by the Commonwealth about [Myers's] case" and, "[i]n fact, what the Commonwealth provided [Maloney with] was far more detailed than what [Maloney] could recall." (Id. at 123.)[10] The Court finds Maloney's testimony on these points to be credible. On this record, the second Chandler factor dispositively cuts against a finding of actual conflict. See Chandler, 89 F. App'x at 840; Freund, 165 F.3d at 859.

Moreover, Khavkin simply has not proved the ultimate question: "whether counsel's allegiance to [Khavkin] was compromised by competing obligations owed to [Myers]." Chandler, 89 F. App'x at 840-41. That is, of course, the definitive question. And, as to it, the proof simply fails.

**B.    Khavkin Fails To Demonstrate An Adverse Effect**

To be entitled to the relief that he seeks, Khavkin must show that the alleged actual conflict (even if there was one—which there was not) adversely affected Maloney's performance in representing Khavkin.   To meet this facet of the conflict calculus, Khavkin must establish that "the attorney took action on behalf of one

---

[10] Myers agreed in his conflict waiver that Maloney had no relevant confidential information about Myers that would affect Maloney's defense of Khavkin outside of his prior convictions. (Evid Hrg. Ex. 3, at 59.)   That is informative but not highly persuasive information, because Myers is hardly a credible judge of what is useful in Khavkin's case.

client [Myers] that was necessarily adverse to the defense of the other [Khavkin] or failed to take action on behalf of one because it would adversely affect the other." <u>Williams v. French</u>, 146 F.3d 203, 212 (4th Cir. 1998) (citation omitted). Put another way, Khavkin must demonstrate that "the actual conflict of interest compromised his attorney's representation." <u>Stephens</u>, 570 F.3d at 209. The United States Court of Appeals for the Fourth Circuit has specified a three-part inquiry for analyzing this issue:

> <u>First</u>, the <u>petitioner must identify a plausible alternative defense</u> strategy or tactic that his defense counsel might have pursued. <u>Second</u>, the <u>petitioner must show</u> that the <u>alternative</u> strategy or tactic <u>was objectively reasonable</u> under the facts of the case known to the attorney at the time of the attorney's tactical decision. [To demonstrate objective reasonableness,] the petitioner must show that the alternative strategy or tactic was "clearly suggested by the circumstances." <u>Finally</u>, the <u>petitioner must establish</u> that the defense counsel's <u>failure to pursue that strategy</u> or tactic <u>was linked to the actual conflict</u>.

<u>Id.</u> (alteration in original) (quoting <u>Mickens v. Taylor</u>, 240 F.3d 348, 361 (4th Cir. 2001) ("<u>Mickens</u> test").[11]

###    1.    Khavkin Identifies No Plausible Alternative Defense Or Tactic

The first facet of the <u>Mickens</u> test requires Khavkin to identify "plausible alternative defense strategy or tactic that

---

[11] Khavkin is "not required to show that the strategy or tactic not taken would have been successful, but only that it would have been objectively reasonable." <u>United States v. Nicholson</u>, 611 F.3d 191, 197 (4th Cir. 2010) (citation omitted).

his defense counsel might have pursued." <u>Mickens</u>, 240 F.3d at 361. Khavkin has identified proceeding to trial as the assertedly plausible alternative defense strategy that Maloney should have pursued. Khavkin contends that proceeding to trial was "plausible" based on his own insistence that he was not guilty and Morrissey's initial agreement with that assessment early in his representation of Khavkin. (SAP ¶ 16; ECF No. 60, at 46-48.)[12] In support of his argument that trial was a plausible alternative, Khavkin first suggests that "Maloney was aware [that Khavkin] had substantial defenses, including a DNA analysis report that supported the theory that Crews, rather than Petitioner, had killed McCoy, and Crews's sworn statement that he had not seen Petitioner stab anyone." (SAP ¶ 25.) Second, Khavkin also suggests that his mere stated desire to proceed to trial made it a plausible option. As discussed below, the record demonstrates that neither the two alleged lines of defense advanced by Khavkin here, nor his stated desire for a trial, rendered trial a plausible alternative defense strategy.

---

[12] Morrisey had conducted a great deal of investigation and interviewed witnesses before Maloney's involvement and Maloney reviewed Morrissey's notes. (ECF No. 60, at 113.) Maloney agreed that it was "probably fair" that, in the beginning of his representation, that Morrissey had communicated to the family and to Khavkin "that he was <u>optimistic</u> about what the results of the case would be." (<u>Id.</u> at 113 (emphasis added).)

a.   The Alleged DNA Analysis Report

According to Khavkin, "Maloney was aware that [Khavkin] had substantial defenses, including a DNA analysis report that supported the theory that Crews, rather than [Khavkin], had killed, McCoy." (SAP § 25.)   Other than this one reference, Khavkin fails to elaborate any further on this DNA analysis report that was allegedly favorable to Khavkin.   Khavkin certainly has not pointed the Court to any DNA analysis report that would provide the "substantial defense[]" as alleged.

To the contrary, the record establishes that the DNA analysis reports in this case actually implicated Khavkin in the murder. The knife used in the murder was found to have McCoy's blood on it and witnesses saw Khavkin hide the knife after leaving McCoy's cell. (ECF No. 34-3, at 24-25, 65.)   Khavkin's DNA was found under McCoy's fingernails and Khavkin had scratches on his neck.   (Id. at 65.)   Additionally, "McCoy's DNA was found on pants and boot found within . . . Khavkin's personal property." (Id. at 25.)   It is correct that McCoy's DNA was found on some of Crews' clothing, but the record does not disclose how a defense theory that Crews, not Khavkin, murdered McCoy, was a plausible one.   Therefore, the DNA analysis reports did not provide a substantial defense for Khavkin that would have rendered trial a plausible alternative to pleading guilty.

21

b.    Crew's Initial Statement Provided To Morrissey

Second, Khavkin identifies as a "substantial defense[] . . . Crews's sworn statement that he had not seen [Khavkin] stab anyone." (SAP ¶ 25.) Initially, Kayvon Crews, Khavkin's co-defendant, signed a statement indicating that he "never saw Dmitry Khavkin stab anybody. I told the detective that the white boy did it and that's why I beat him up." (Evid. Hrg. Resp't's Ex. 1, at 20.) On December 14, 2012, Morrissey conveyed to Marina Khavkin the notion that the stabbing may have been an accident. (Evid. Hrg. Resp't's Ex. 1, at 16.) On April 1, 2013, Morrisey again conveyed to Marina Khavkin the information about Crews' statement, and that in his opinion, "As I have repeatedly said, I have done all of my investigation necessary to conclude that your brother is not guilty of murder." (Evid. Hrg. Resp't's Ex. 1, at 14.)

Maloney affirmed that initially, "Mr. Khavkin was very optimistic based on . . . what I believe was Mr. Morrissey's interview with the co-defendant where the co-defendant had said something that would be very helpful to Mr. Khavkin." (ECF No. 60, at 115 (punctuation corrected).) Maloney explained that, "then as the forensic evidence, particularly the DNA, came back and other witnesses began coming forward, the outlook became less bright." (Id.) At the point when plausible defense strategies were fast

waning, Maloney, not Morrissey, was the attorney meeting with Khavkin. (Id.)[13]

What is more, Crews proved to be not just an unreliable witness, but one who was certain to implicate Khavkin. Morrisey explained that after investigation, it "became abundantly clear that the co-defendant, Mr. Crews, was going to testify on behalf of the Commonwealth and incriminate our client." (See Evid. Hrg. Resp't's Ex. 1, at 3.) Accordingly, Crews's initial statement proved not to provide a plausible defense, much less a substantial defense as characterized by Khavkin. Thus, Khavkin again has failed to show that trial was a plausible alternative defense strategy.

### c. Khavkin's Stated Desire For A Trial Did Not Make Trial A Plausible Option

Khavkin also seemingly takes the view that his stated desire to proceed to trial, standing alone, makes that tactic a "plausible" alternative defense strategy. That is not so. Khavkin has not demonstrated that, at the time he entered his guilty plea, he contemporaneously retained a desire to proceed to trial. To the contrary, as discussed in Part V.B.3.b, the record reflects

---

[13] It is unclear why, at this point, Maloney, not Morrissey took the lead on the case. But, clearly Maloney was in charge of the defense by that time.

that Khavkin had no desire to proceed to trial at the time he entered his guilty plea.[14]

Thus, although Khavkin identifies proceeding to trial as an alternative tactic that counsel may have pursued but for the alleged conflict, given the record, going to trial was not a "plausible" strategy or tactic. Mickens, 240 F.3d at 361. Thus, Khavkin has failed to satisfy the first element of the Mickens test.

### 2.   Khavkin Fails to Demonstrate An Objectively Reasonable Alternative Strategy Or Tactic Exists

Second, Khavkin has failed to "show that the alternative strategy or tactic was objectively reasonable under the facts of the case known to the attorney at the time of the attorney's

_____

[14] The stabbing incident occurred on June 7, 2012. (SAP ¶ 5.) Khavkin retained Morrissey in September 2012. (Id. ¶ 15.) Khavkin was indicted on March 28, 2013.  Indictment at 1-2, Commonwealth v. Khavkin, Nos. CR13-73-00 through 04 (Va. Cir. Ct. filed Mar. 28, 2013). It is alleged that, at some unidentified time, Khavkin had "told Mr. Morrissey that he was not guilty and wanted to go to trial." (SAP ¶ 16.)  The trial was set to begin December 10, 2013. (Id. ¶ 21.)  Khavkin alleges that during Maloney's last visit to Khavkin in November 2013, Maloney informed Khavkin that there was no chance to win the case and that Khavkin had to plead guilty, that if he went to trial, he would receive a life sentence, and that he would not try the case regardless of Khavkin's desires. (Id. ¶ 23.)  Khavkin alleges that "Mr. Maloney declined to provide [Khavkin] with an explanation for his conclusions and did not provide or suggest alternative counsel who would represent him at trial if Petitioner chose not to change his plea." (Id. ¶ 24.) However, Khavkin never affirmatively states that it was his desire to go to trial at the time counsel presented him with the Plea Agreement.  What is more, any such allegation would be directly belied by the record.

tactical decision." <u>Id.</u>  To satisfy this part of the <u>Mickens</u> test,
Khavkin "must show that the alternative strategy or tactic" of
proceeding to trial, "was 'clearly suggested by the
circumstances.'"  <u>Mickens</u>, 240 F.3d at 361 (quoting <u>Tatum</u>, 943
F.2d at 376).  Khavkin has not made this showing.

    According to Khavkin, he originally hired Morrissey and "told
Mr. Morrissey that he was not guilty and wanted to go to trial.
Mr. Morrissey agreed with that approach to the case."  (Sec. Am.
§ 2254 Pet. ¶ 16.)  Khavkin's sister, Marina Khavkin,[15] agreed that
Morrissey was very optimistic about the defense and she
communicated this to her brother.  (ECF No. 60, at 22.)
Accordingly, Khavkin wanted to proceed to trial.  (<u>Id.</u> at 23.)
Khavkin contends that Morrissey initially "promised [Khavkin] and
guaranteed [Khavkin] that [Morrissey] would beat [his] case." (<u>Id.</u>
at 46.)  Khavkin was "very satisfied" with Morrissey because
"[Morrissey] felt confident, and he promised [Khavkin] that he
would beat [his] case."  (<u>Id.</u> at 47-48.)

    Notwithstanding his initial strongly stated view that Khavkin
was not guilty, Morrisey changed that sentiment as the
investigation progressed and the evidence implicated his client.
In particular, Morrissey averred:

---

[15]  Marina Khavkin, Khavkin's older sister who lives in
Brooklyn, New York (ECF No. 60 at 17-18), also testified at the
evidentiary hearing about, <u>inter alia</u>, her family's retention of
Morrissey.

> As we got closer to the trial date, Mr. Maloney and I had daily conversations regarding this case. In due course, it became <u>abundantly clear</u> that the co-defendant, <u>Mr. Crews, was going to testify on behalf of the Commonwealth</u> and <u>incriminate our client</u>. Additionally, <u>numerous pieces of blood laden clothing</u> including <u>incriminating DNA</u>, were going to incriminate the defendant.

(Evid. Hrg. Resp't's Ex. 1, at 3 (emphasis added).)

After interviewing witnesses and conducting discovery, Maloney and Morrissey identified two possible trial strategies and defenses. (ECF No. 60, at 98-99.) The first defense was that Khavkin was not in "the area at the time because he was housed in a different pod . . . and there was not authorization for him to be in that pod, that he couldn't have been there." (<u>Id.</u> at 98-99.) The second defense "was that he was defending himself after being assaulted by one or more of . . . the decedent and the other complainant. . . ." (<u>Id.</u> at 99.) Maloney "didn't have a high level of confidence" that "either of these trial strategies, in [his] professional opinion, would likely result in an acquittal at trial." (<u>Id.</u>)

Maloney was also stuck with Khavkin's inculpatory statement to a correctional officer after he learned that the victim had died. Khavkin stated to the officer: "Oh, my God. Oh, my God. I didn't mean to do it. I didn't mean to do it." (Dec. 5, 2013 Tr. 22.) This statement, considered in perspective of Crews' inculpatory testimony and the DNA evidence implicating Khavkin,

effectively precluded both of the possible defense strategies identified by Maloney and Morrissey.   And, Khavkin has not shown that either line of defense was supported by evidence, much less that either was objectively reasonable.

Khavkin was charged with murder in the first degree in the commission of, or attempt to commit, robbery.   Indictment at 1-2, Commonwealth v. Khavkin, Nos. CR13-73-00 through 04 (Va. Cir. Ct. filed Mar. 28, 2013); see Va. Code Ann. § 18.2-32 (West 2018). The Commonwealth therefore did not have to prove intent to kill to obtain a conviction for first-degree murder, only that the killing occurred during the "commission of, or attempt to commit . . . robbery."   Id.; Goodson v. Commonwealth, 467 S.E.2d 848, 854 (Va. Ct. App. 1996) (citation omitted) (internal quotation marked omitted).[16]   Thus, Khavkin's statement that, "I didn't mean to do it," (Dec. 5, 2013 Tr. 22), precluded any defense that Khavkin did not stab the victim or that he was not present during the murder.   Moreover, the statement was tantamount to a confession

---

[16] "Where a person maliciously engages in criminal activity, such as robbery, and homicide of the victim results, malice inherent in the robbery provides the malice prerequisite to a finding that the homicide was murder.   Neither premeditation nor an intent to kill is an element of felony murder; only malice is required." Goodson, 467 S.E.2d at 854 (citation omitted) (internal quotation marked omitted).

to first-degree murder, if, of course, the Commonwealth could prove that Khavkin had the intent to commit robbery.[17]

Putting aside for the moment, the lack of viable defenses, and the overwhelming evidence of Khavkin's guilt, there were other factors that made proceeding to trial not an objectively reasonable option. Maloney testified that, with respect to the jury pool, he likely discussed with Khavkin that Brunswick County "was a more rural and conservative area that probably saw fewer homicides than a larger area like the [C]ity of Richmond." (ECF No. 60, at 100.) Maloney "didn't think a Brunswick jury would look terribly favorably on someone who was incarcerated for committing a violent crime" committing a subsequent violent crime while he was incarcerated. (Id.)  Maloney believed that the ultimate outcome

---

[17] Indeed, at no time in his SAP or in the Brief in Opposition does Khavkin deny that he is guilty of attempted robbery or killing the victim. However, the Court notes that Khavkin vaguely suggested that he was innocent in an affidavit that he submitted with his Reply to the Motion to Dismiss in the Circuit Court. However, Khavkin's affidavit was not properly before the state court and was not considered. In that affidavit, Khavkin states: "I did not kill anybody or stab anybody. I did not start any fight or try to rob anybody. I was just in the other pod hanging out. A fight started and I remember somebody tried to choke me, and I pushed him off me." (Evid. Hrg. Pet'r's Ex. 2.)  Even if the Court were to consider the affidavit here, such "[a]iry generalities [and] conclusory assertions . . . [are not] admissible evidence . . . ." United States v. Roane, 378 F.3d 382, 400-01 (4th Cir. 2004) (some internal quotation marks omitted) (first and third alteration in original). Moreover, these allegations contradict his statements under oath during his plea hearing that he was in fact guilty. Khavkin is bound by his statements under oath that he was in fact guilty.

of the plea offer from the Commonwealth was favorable because Khavkin "was facing a life term . . . and the evidence against him was pretty strong." (Id. at 102.)

Finally, Khavkin faced a sentence of life plus forty-five years of incarceration had he not entered into the guilty plea which capped his sentence at twenty-four years and two months. Considering the evidence and the reality that Khavkin faced conviction based on that evidence in perspective of the available alternative of a plea and a limited sentence, it cannot be said that trial was an objectively reasonable alternative to the plea.

Simply put, on this record, it is clear that trial was not an objectively reasonable alternative defense strategy. Thus, Khavkin has failed to satisfy the second facet of the Mickens test.

### 3.  Khavkin Establishes No Actual Link To The Conflict

Finally, Khavkin has not "establish[ed] that [his] defense counsel's failure to pursue [the assertedly objectively reasonable plausible alternative defense strategy] or tactic was linked to the actual conflict." Id. An actual link can be shown by "establish[ing] that the alternative defense was inherently in conflict with or not undertaken due to the attorney's other loyalties or interests." Mickens, 74 F. Supp. 2d 586, 603-4 (E.D. Va. 1999) (quoting Freund, 165 F.3d at 860.) Even if proceeding to trial could be considered a plausible, viable strategy (which it was not), the record here dispels the contention that the

failure to proceed to trial is attributable to any conflict of interest on the part of Maloney. Rather, Maloney's failure to take the case to trial was based entirely on Khavkin's knowing and voluntary decision to plead guilty, pursuant to favorable plea terms.

### a. The Decision To Forgo Trial Was Not In Conflict With Any Loyalty to Myers

As explained in Part V.A, Maloney's previous representation of Myers did not create an actual conflict of interest with respect to his subsequent representation of Khavkin. In addition, nothing in the record suggests that the potential conflict caused counsel to forgo trial and to coerce Khavkin into pleading guilty. Rather the record establishes that, Maloney had explained to Myers that, as Khavkin's counsel, he would have to attempt to discredit him through cross-examination. (ECF No. 60, at 86.) Myers signed a waiver freeing Maloney of any limit in cross-examining Myers had the matter gone to trial. (Evid. Hrg. Ex. 3, at 59.) Maloney also agreed that he would have been "[a]bsolutely confident cross-examining Myers at trial." (ECF No. 60, at 95.) Maloney's testimony is credible.

Maloney's testimony is bolstered by a record that establishes that Maloney was prepared to try the case if Khavkin had not decided to plead guilty. Khavkin entered into the guilty plea on December 5, 2013 and the trial was set to begin on December 10,

2013.  (ECF No. 60, at 108.)[18]  Maloney testified that, if Khavkin had wanted to take this matter to trial, he would have "[t]ried the case." (Id. at 107.)  Maloney explained that he was ready to try the case because Khavkin's file had "summaries of the expected testimony of each of the witnesses, I had interviewed or attempted to interview most, if not all, of the witnesses.  I had prepared jury instructions or at least begun the preparation of jury instructions." (Id. at 108.)  The record confirms what Maloney said.

The record also shows that Maloney and Morrissey intended to try the case together, and that Morrissey had a scheduling conflict and was in the process of attempting to move the Khavkin trial date.  (Id.)  If Khavkin had "not wanted to plead guilty, [Maloney and Morrissey] would have pursued a motion to continue . . . ." (Id. at 108.)

Khavkin has not shown that any loyalty to Myers caused Maloney to forgo trial and coerce Khavkin to plead guilty.  Indeed, Khavkin has offered no evidence to that effect.  His case on that aspect of the test is simple speculation.

---

[18] Maloney indicated that the trial was scheduled for December 12, 2013; however, it was actually scheduled for December 10-12, 2013. (See Evid. Hrg. Resp't's Ex. 1, at 11.)

> **b.    The Decision To Forgo Trial Was Khavkin's Alone**

The decision not to pursue trial also cannot be attributed to any conflict of Maloney, because Khavkin knowingly and voluntarily decided to plead guilty on his own accord.  As discussed above, the evidence was such that Khavkin faced likely conviction for first-degree murder and a resulting sentence of life plus forty-five years.  Although, Khavkin insists that Maloney forced him into pleading guilty, the facts surrounding the entry of the guilty plea dispel that notion.

Khavkin "very early on . . . talked about taking a plea, but he didn't want it to be for double digits were his terms. [Maloney] took that to mean ten years or less.  That was months before trial."  (Id. at 119.)  Maloney met with Khavkin at Sussex II on December 4, 2013, the day before Khavkin entered into the Plea Agreement, and discussed both the strength of his case and the potential plea offer from the Commonwealth.  (Evid. Hrg. Resp't's Ex. 2, at 11.)  Maloney and Khavkin discussed that the Commonwealth would likely "offer a fixed sentence of 25 and one-half years on pleas of guilty to second degree murder, attempted robbery, and unlawful wounding)," Khavkin's "desire to cooperate against others involved in his case and with authorities on other criminal activity in Brunswick (in fact he spent much of our meeting discussing information that he had and his desire to provide it in

the hopes that he would gain assistance with sentence)," and that "there was certainly the risk he could receive up to 18 years of comeback time."    (Id.)    After reviewing "the Commonwealth's expected evidence which [Maloney] had reviewed with [Khavkin] on numerous occasions, [Khavkin] readily agreed that his chances at trial were not great and while 25 1/2 years was significant amount of time, it was better than the alternative. . . .  Khavkin asked me to contact the Commonwealth's Attorney's office and accept the agreement on his behalf."  (Id.)   Viewed as a whole, the record supports the credibility of Maloney's statement.

It is true Maloney did not have in hand the specific Plea Agreement that Khavkin signed until both he and Khavkin were at the courthouse.   (ECF No. 60, at 104.)    However, Maloney had discussed the terms of the plea agreements with Khavkin while he was in Sussex, and Khavkin had already agreed that he was willing to plead guilty to those terms.   (Id.)  While at the courthouse, Maloney read the Plea Agreement to Khavkin, and he did not recall Khavkin asking any questions.   (Id. at 103.)[19]   Nor has Khavkin offered proof that he either questioned, or protested, the plea terms.   Khavkin signed the Plea Agreement and the plea hearing waiver of rights form in front of Maloney at the courthouse.  (Id.

---

[19] Morrisey too avers that "[a]fter a thorough discussion with our client, it was Mr. Khavkin's decision to plead guilty."  (Evid. Hrg. Resp't's Ex. 1, at 3.)

at 103, 105, 106.)  With the waiver of rights form provided by the Circuit Court, Maloney "will always read the question and then write the answer that [defendants] give me, or anticipate the answer, write it, look to them, make sure they acknowledge each question."  (Id. at 105, 107.)

Khavkin insists that the guilty plea was not his knowing and voluntary choice.  However, Khavkin's testimony about entering into his Plea Agreement was comprised of a selective, and ultimately unconvincing, lack of memory.  Khavkin stated that he remembered pleading guilty because "Mr. Maloney didn't want to go to trial," but that he could not remember the statements that he made under oath during the guilty plea colloquy.  (ECF No. 60, at 62.)  When asked about his specific statements under oath during the plea hearing that he was satisfied with Maloney, that he had talked about potential defenses, that he had met with Maloney "millions of times," and that it was Khavkin's own decision to plead guilty, Khavkin testified only that, "Mr. Maloney instructed me to say that."  (Id. at 63-65.)  However, Maloney pointedly denied that he had so instructed Khavkin.  (Id. at 106-07.)  The Court finds that Khavkin's testimony is not credible and that Maloney's testimony on the point is credible.  The record shows that Khavkin answered the trial judge's questions appropriately and demonstrated an understanding of what was being asked of him, rather than simply parroting back a memorized yes or no answer as

he suggests that he did.   More importantly, to believe Khavkin's testimony on the point, the Court would have to disbelieve Maloney. That the Court declines to do.

Khavkin also testified that Maloney never read him the Plea Agreement (ECF No. 60, at 69),[20] which is entirely incredible, and belied by his statements under oath during the plea hearing that he had "[gone] over each and every detail of the [plea] agreement with Mr. Maloney before he signed it" and that he "understood each and every part of the agreement."   (Dec 5, 2013 Tr. 11.)   When asked, Khavkin claimed that he could not remember Maloney explaining to him anything about the great deal of evidence against him.   (Id. at 61-62.)[21]   Khavkin explained that he did not remember because, "[t]his happened too many years ago."   (Id. at 61.) Khavkin's insistence that he remembers nothing about entering into his guilty plea lacks the ring of truth.[22]   Moreover, Khavkin's

---

[20] Khavkin also testified during the evidentiary hearing that he could not read the Plea Agreement that was introduced as an exhibit so it is unclear how he would know from looking at the document whether Maloney had read it to him, much less read it to him "[w]ord for word."   (ECF No. 60, at 69.)

[21] Specifically, Khavkin indicated that he could not remember Maloney telling him that six or seven inmates were going to testify against him, including his co-defendant, Kayvon Crews, and the victim, Myers, that the DNA found under the victim's fingernails matched Khavkin's DNA, and that clothing found in Khavkin's cell had DNA that matched the victim's DNA.   (Id. at 61-62.)

[22] The Court cannot square Khavkin's testimony that he remembers nothing about the events leading to the charges (ECF No. 60, at 57), and remembers nothing about his Plea Agreement

35

lack of memory standing alone, is not enough to demonstrate that his plea was not knowingly and voluntarily entered at the time. In sum, any "unadorned, verified assertion made by [Khavkin] in his petition," that he wanted to go to trial at the time he entered the guilty plea is inconsistent with the record. Strong v. Johnson, 495 F.3d 134, 139-40 (4th Cir. 2007) (explaining that it is reasonable to credit specific evidence over a petitioner's unadorned assertion or conclusory affidavit).

Based upon this record, Khavkin has failed to establish that an actual conflict of interest influenced counsel's strategy in the case. Counsel's strategy was not impacted by his previous representation of the victim, but rather soundly based on the facts stacked against his client and the benefits of the Plea Agreement. Indeed, pleading guilty to the lesser-included charges with a significantly reduced sentence was the most objectively reasonable tactic for a client who faced almost certain conviction of murder and a sentence of life in prison. Moreover, the record establishes that Khavkin knowingly and voluntarily pled guilty. Khavkin offers no persuasive argument that the failure to proceed to trial was linked to an alleged actual conflict.

---

(ECF No. 60, at 60), with his specific memory that Maloney did not read or go over the Plea Agreement with him and with his specific memory that Maloney told him exactly how to answer the Circuit Court's questions during the plea hearing.

In the final analysis, Khavkin's claim that counsel suffered from an actual conflict that adversely effected his representation fails because there is no evidence in the record to support a finding that Khavkin's guilty plea resulted from Maloney's previous representation of Myers. Therefore, Khavkin has failed to prove either element necessary to establish a violation of his Sixth Amendment right to conflict-free counsel. For this reason alone, Claims I and III must be dismissed. In any event, as discussed below, the record establishes that, not only was Khavkin aware of the potential conflict, but he signed a written waiver of the potential conflict.

### C.   Khavkin Knowingly Waived The Potential Conflict

In the SAP, Khavkin claims that he was unaware of the conflict and did not waive it, and only learned about the potential conflict from state habeas counsel. (SAP ¶¶ 37-38, 45.) This statement is entirely refuted by the credible record.

"A defendant may waive his right to conflict-free representation, provided that the waiver if knowing, intelligent, and voluntary." United States v. Akinseye, 802 F.2d 740, 744-45 (4th Cir. 1986) (internal citations and citations omitted); see United States v. Wheat, 813 F.2d 1399, 1402 (9th Cir. 1987) (citation omitted). As discussed below, Khavkin clearly waived any potential conflict and that waiver was both knowing and voluntary.

### 1.   Maloney Obtained A Waiver From Khavkin

On November 27, 2013, Maloney notified Khavkin that he had previously represented Myers and that is the date on which Khavkin signed the waiver.  (ECF No. 60, at 89-90.)  Maloney had obtained a waiver from Myers before speaking with Khavkin.  (Id. at 95.) Maloney explained to Khavkin that he "didn't think there was an actual conflict of interest, and [he] asked [Khavkin] if he thought there was, and he didn't think there was either.  So that's why we did the waiver."  (Id. at 119-20.)  Although Maloney did not know the exact words Khavkin used when discussing the potential conflict, "whatever words he did use . . . that's what [Maloney] put in the waiver."  (Id. at 120.)  Maloney "wrote the waiver with [Khavkin], like explained it to him, wrote out the waiver, and then had him sign it so we made sure we were on the same page." (Id. at 120.)  The waiver stated:

> I, Dmitriy Khavkin, have been advised by my attorney, James T. Maloney, that Charles Meyers [sic], a likely witness in my case, was previously represented by Mr. Maloney [and] by Joseph D. Morrissey.  I have discussed w/ Mr. Maloney the potential conflict of interest and do not believe there is an actual conflict of interest.  Notwithstanding the potential, I wish for Msrs. Maloney [and] Morrissey to continue to represent me in Brunswick Circuit Court on my charges set for trial on 12/10/13.

(Evid. Hrg. Pet'r's Ex. 1, at 1.)   This waiver is entirely consistent with the waiver that Maloney prepared for Myers and that was signed by Myers.

Maloney testified with certainty that he had explained the conflict and had Khavkin sign the waiver on this date because he dictated a memorandum to file "summarizing the subjects that we discussed, and it references the fact that I had him sign a waiver." (ECF No. 60, at 89-90; see Evid. Hrg. Resp't's Ex. 2, at 49-50.) Maloney dictated the November 27, 2013 Memorandum as he was leaving the facility in his car driving home and an assistant would have transcribed it over the next week. (ECF No. 60, at 98.) The Memorandum provides that Maloney, "began the meeting by advising [Khavkin] that I had previously represented victim Myers and I had him sign a waiver that I drafted. He indicated he clearly understood and absolutely wanted me to continue representing him." (Evid. Hrg. Resp't's Ex. 2, at 49.) Maloney affirmed that the waiver in the record was the waiver that he drafted and that Khavkin signed. (ECF No. 60, at 91.) Maloney explained the conflict to Khavkin in "the same summary that [he] just told [the Court] about [that] really the only reason I got to talk to Mr. Myers was because he had recognized me." (Id. at 91.) Although Maloney could not recall specifics, he was "sure [he] explained it to him in the context of Mr. Myers was going to be a witness and I was going to be adverse to Mr. Myers." (Id. at 92.) Maloney also "recall[ed] telling [Khavkin] that I didn't recall anything specific about Mr. Myers so there would be no actual conflict of interest." (Id. at 94.) Maloney did not believe he

had a conflict of interest and would have been "[a]bsolutely confident cross-examining Myers at trial." (<u>Id.</u> at 94-95.) The contemporaneous Memorandum supports the existence and the validity of the waiver.

Maloney wrote out the conflict waiver, "so [he] would have made sure to read it to [Khavkin] because it -- it wasn't his [Khavkin's] writing." (<u>Id.</u> at 96.) Khavkin signed the waiver in front of Maloney and afterward indicated that he wanted to continue to have Maloney and Morrissey represent him. (<u>Id.</u> at 97.) Maloney testified that, if Khavkin had notified him that he no longer wanted Maloney to represent him, he [Maloney] would have "[w]ithdrawn from the case." (<u>Id.</u>)

Maloney did not try to "bury the conflict," as Khavkin suggests (Pet'r's Reply Post-Hearing Br. 2, ECF No. 66), because Maloney shared the information about the potential conflict with the prosecutor. Ms. Green "was aware of the apparent conflict," because both Maloney and Myers told her about it. (ECF No. 60, at 121.) At some point, Maloney knew that he told Ms. Green that he had obtained waivers from Khavkin and Myers "because her letter to [Maloney] says something about waivers." (<u>Id.</u> at 121.)

A letter from Ms. Green to Maloney, dated after Khavkin pled guilty, notes: "I also think you should file something regarding your former representation of Myers. If you have both Myers and Khavkin's written waiver, I would appreciate having it filed with

40

Court - or at least having a copy for my file that will not be covered by attorney - client privilege, should it need to be disclosed at any future date (habeas, bar complaint, etc.)" (Evid. Hrg. Ex. 5, at 74.)  The prosecutor's request notwithstanding, Maloney, for reasons neither expressed nor readily apparent, did not provide her with the waivers (ECF No. 60, at 121-22), and did not file them with the Circuit Court.  That fact, however, does not support Khavkin's assertion that he did not execute the waiver. On that point, the record permits a finding that Maloney is credible.

### 2.   The Criminal File Was Not Forwarded In Full

James Stephen Ellenson was retained by Khavkin to represent him in his state habeas proceedings in the Circuit Court.  (ECF No. 60, at 4.)  In his preparation, Ellenson discovered Ms. Green's letter (requesting copies of the written waivers) in the Circuit Court file from Ms. Green to Maloney.  (Id. at 5-6; Evid. Hrg. Ex. 5, at 74.)  However, Ellenson did not follow up with Ms. Green to see if she had the waivers mentioned in the letter.  (ECF No. 60, at 13.)   Ellenson subsequently determined that Maloney had represented Myers in a bond hearing in General District Court. (Id. at 6-7.)

Ellenson received Maloney's file on Khavkin from Khavkin's sister, Marina Khavkin.  (ECF No. 60, at 8.)  Ellenson believed it was the complete file.  (Id. at 12.)  Ellenson did not received a

copy of the file directly from Maloney. (Id. at 8-9.) Khavkin's waiver form was not in the file that Ellenson received from Khavkin's family. (Id. at 9.) Maloney's memos to file, including the memo from the date Khavkin signed the waiver, were also not in the file that Ellenson received. (Id. at 10.) Ellenson explained that, "I would not have taken the case if I had seen that memo prior to filing it, because it explains a whole lot of stuff in there, and I'm not going to take money from somebody and do a case if I know I ain't got a chance to win the case. (Id. at 11.)

Marina Khavkin obtained her brother's criminal file from Maloney by mail. (Id. at 24.) Ms. Khavkin testified that the waiver form was not in the file that she received from Maloney, and that she reviewed the entire file. (Id. at 24-25, 26.) She also averred that she "[a]bsolutely" forwarded everything found in the file to Ellenson. (Id. at 25.) However, she then also testified to the contrary when she said that she had removed from the file that she had sent to Ellenson transcriptions of recorded telephone calls between her family and Khavkin. She then testified that those were "the only thing that [she] left out" of the file before she forwarded the file to Ellenson. (Id.)[23]   Marina

_____

[23] The transcriptions of phone calls that Marina Khavkin removed from the file did not just contain personal family related matters but reveal that Khavkin may have been attempting to lie to his attorneys. For example, the transcripts insinuate that Khavkin may have been attempting to fabricate a defense strategy that inmates were demanding money from him and he was sexually

Khavkin's testimony that she forwarded the entire criminal file to Ellenson, is not credible, as explained below.

Maloney testified that, when he was deposed in 2019 in this case, he sent a text message to a clerk at his office and asked her to look through Khavkin's file to see if it contained a conflict waiver signed by Khavkin. (ECF No. 60, at 75; Evid. Hrg. Ex. 25.) The clerk found what she believed to be the waiver and sent Maloney a text message with a photograph of the waiver as found in the file. (ECF No. 60, at 75; Evid. Hrg. Ex. 25.) Maloney testified that the file had not been accessed since shortly after his representation of Khavkin and that the photograph reflected that "the file was sort of sitting on its side so the papers had sort of bent a bit, and that picture, in [his] opinion, reflects a curvature with the stack of the paper work as though they had been sitting under their own weight for" some time. (ECF No. 60, at 76, 78.) A review of the photograph supports Maloney's testimony that the waiver had been in the file in place for many years. (See Evid Hrg. Ex. 25.) As Maloney testified, the waiver was maintained in Khavkin's file and "the whole file was kept together." (ECF No. 60, at 97.) Although copies of parts of the file were provided to the family after the guilty plea, Maloney

---

assaulted. (See Evid. Hrg. Ex. 24, at 401, 414-16, 420.) Khavkin also instructed his family during phone calls and letters what to say to the attorneys and not to "say exactly the same thing." (Id. at 427.)

did not keep a copy or an inventory of exactly what he sent to the family at that time. (Id. at 97-98.)

Thus, while the record fails to establish with certainty that Khavkin's waiver was in the file that Maloney forwarded to Marina Khavkin,[24] the Court finds that the waiver was clearly in the original criminal file maintained in Maloney's office. And, the record, taken as a whole, quite strongly teaches that Ms. Khavkin's recollection of the events, is shaky, at best.

### 3.   Khavkin Signed The Conflict Waiver

Marina Khavkin admitted that she was not a present during the meetings between Maloney and Khavkin that took place at the jail and could not say what paperwork may have been signed. (ECF No. 60, at 36.) But Ms. Khavkin testified that the signature on the waiver form, the Plea Agreement, and the waiver of rights form was not her brother's handwriting, because he normally wrote a "D" before his last name. (Id. at 38, 39, 40.)

Ellenson filed Khavkin's affidavit with his state habeas petition. In the affidavit, Khavkin states he "never knowingly signed any waiver for Mr. Maloney." (Evid. Hrg. Ex. 16, at 213.) Khavkin testified that he could not read the waiver form or his

---

[24] A permissible inference arises that Maloney forwarded the complete file to Marina Khavkin and that she removed Myers's and Khavkin's waivers and any reference in the file to these waivers. However, the Court need not draw that inference here, because it has no bearing on the ultimate conclusion that Khavkin signed the waiver and that he knowingly waived any conflict.

own affidavit.   (ECF No. 60, at 51.)   Khavkin testified that the
signature on the conflict waiver was "[a]bsolutely not his own,"
because he signed his name with a "D" first and put two lines going
down."   (Id. at 43.)   As an example of this signature, Khavkin
agreed that the signature on the bottom of his affidavit was his
own.   (Id. at 51.)   Khavkin's signature on both the waiver of
rights form and Plea Agreement did not have a "D."   (ECF No. 60,
at 60, 70-71; Evid. Hrg. Ex. 6, at 80; Evid Hrg. Ex. 7, at 84.)
Khavkin insisted that he did not sign documents like his signature
appears on the Plea Agreement or the waiver of rights form.   (ECF
No. 60, at 60, 70-71.)   However, the signature on both the Plea
Agreement and the waiver of rights form is consistent with his
writing in letters to his family.[25]

Khavkin testified that he never saw the conflict waiver form
shown to him during the evidentiary hearing.   (Id. at 44.)
However, Khavkin later testified he could not read the document
before him.   (Id. at 49.)   Thus, if the Court is to believe
Khavkin's testimony that he could not read the waiver, it is
impossible to conclude that Khavkin was certain that he had never
seen the document.   Khavkin also testified that Maloney never

---

[25] The Plea Agreement, waiver of rights form, and letters to
his family reflect that Khavkin dotted his "i" with a circle.   (See
Evid. Hrg. Ex. 6, at 80; Evid. Hrg. Ex. 8, at 84; Evid. Hrg. Ex.
23, at 355-93.)   Khavkin testified that the letters to the family
were in his handwriting.   (ECF No. 60, at 72-73.)

discussed a potential conflict of interest with him. (Id. at 44.) These statements are not believable when weighed against the evidence of the actual written waiver, Maloney's testimony to the contrary, and Maloney's contemporaneous memo to file documenting Khavkin signing the waiver. The Court concludes that the evidence clearly and convincingly establishes that Khavkin signed the conflict waiver and that his testimony to the contrary is simply not credible.

### 4. The Waiver Was Knowing and Voluntarily Entered

In his Post-Hearing Brief, Khavkin insists that the written conflict waiver and the testimony from the evidentiary hearing do not demonstrate that "the document was sufficient for a 'knowing and intelligent' waiver." (ECF No. 64, at 5.) The record demonstrates otherwise.

Maloney clearly explained the potential conflict to Khavkin. The waiver reflects that Maloney, had previously represented, "Charles Meyers [sic], a likely witness in my case," that he had "discussed w/ Mr. Maloney the potential conflict of interest" and agreed that he did and do not believe there is an actual conflict of interest." (Evid. Hrg. Pet'r's Ex. 1, at 1.) Maloney also "recall[ed] telling [Khavkin] that I didn't recall anything specific about Mr. Myers so there would be no actual conflict of interest," if he was to cross-examine Myers. (ECF No. 60, at 94.) Maloney testified that Khavkin understood what he explained to him

46

and agreed that there was no conflict of interest. (ECF No. 60, at 120.) And, Khavkin also agreed that he wished for Maloney and Morrissey to continue to represent him. (See id.)

Maloney's nearly contemporaneous notes reflect Khavkin's knowing and valid waiver and support Maloney's testimony about the waiver. Maloney documented that he "began the meeting by advising [Khavkin] that I had previously represented victim Myers and I had him sign a waiver that I drafted. He indicated he clearly understood and absolutely wanted me to continue representing him." (Evid. Hrg. Resp't's Ex. 2, at 49.) Thus, the record establishes that Maloney explained the source of the potential conflict and the potential consequences, and that Khavkin agreed that he understood and waived any conflict. The Court finds that Maloney is credible on the pertinent points.

When testifying at the evidentiary hearing, Khavkin tried to present himself as one incapable of understanding what he was doing when he signed the waiver. In the words of an old Appalachian saying: "That dog don't hunt."

Maloney testified that Khavkin had no difficulty understanding him and communicating with him in English during his representation of Khavkin. In the plea colloquy in the state court, Khavkin agreed under oath that he understood English and

clearly understood the questions that the Circuit Court asked him because he provided appropriate answers.[26]

In addition, a brief review of the letters to Khavkin's family[27] and transcripts of Khavkin's phone calls with his family in 2012 and 2013 depict a person who has no difficulty communicating or understanding others in Russian or English. They also establish that he was able to understand defense strategy. See supra n.18. Khavkin simply has not established that he lacked an understanding of the potential conflict and potential consequences, and that the conflict waiver was anything other than knowing and voluntary. Thus, the record establishes that Khavkin also waived any potential conflict.

## VI. CONCLUSION

For the foregoing reasons, Claim I and the coercion portion of Claim III lack merit and will be dismissed. The RESPONDENT'S MOTION TO DISMISS (ECF No. 32) will be granted. Khavkin's claims will be dismissed and the petition for a writ of habeas corpus

---

[26] Certainly the state court judge would not have accepted Khavkin's plea had he not been satisfied that Khavkin did not understand the plea proceeding and the plea terms.

[27] If the Court is to believe Khavkin's testimony that he had someone write the letters for him and then he copied these letters in his own writing because he lacked an understanding of the English language (ECF No. 60, at 71-72; see Evid Hrg. Ex. 23), Khavkin still had to provide the content of the letters to someone orally in English to transcribe.

will be denied. The action will be dismissed.  A certificate of appealability will be denied.[28]

The Clerk is directed to send copy of the Memorandum Opinion to counsel of record.

/s/  _REV_

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date: February _24_, 2021

---

[28] An appeal may not be taken from the final order in a § 2254 proceeding unless a judge issues a certificate of appealability ("COA").  28 U.S.C. § 2253(c)(1)(A).  A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'"  Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 & n.4 (1983)).  Khavkin fails to make this showing.